# EXHIBIT F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X
KARINE TRAVIESO,

Index No.: 156816/2021

Plaintiff,

-against-

**AMENDED COMPLAINT**

MAJOR LEAGUE SOCCER, L.L.C., and JOANN NEALE, and GARY STEVENSON, individually,

Defendants.
------------------------------------------------------------------------X

Plaintiff Karine Travieso ("Plaintiff") by and through her attorneys, Stagg Wabnik Law Group LLP, complaining of Defendants Major League Soccer, L.L.C. ("MLS"), JoAnn Neale ("Neale"), and Gary Stevenson ("Stevenson") (collectively "Defendants") herein alleges as follows:

**NATURE OF THE ACTION**

1. Plaintiff, a dedicated and well-regarded media professional, was forced to endure discrimination based on her race and retaliation for complaining about racial discrimination by Defendants. Plaintiff recognized the race-based discrimination and lack of inclusion occurring at MLS, and sought to encourage MLS to address such discrimination and to promote diversity throughout its corporate ranks, particularly after the George Floyd murder. In response, Defendants removed her from key responsibilities, excluded her from meetings and discussions, and irrationally blamed her for mistakes by others. Plaintiff complained about that racial discrimination and retaliation to Human Resources, but Defendants failed to investigate, remedy, or even address that complaint. Instead, only weeks after making that complaint, Defendants discharged Plaintiff. Plaintiff was discriminated and retaliated against in violation of the New York State Human Rights Law ("NYSHRL" or "Executive Law"), N.Y. Exec. L. §§ 290 *et seq*., New York City Human Rights Law ("NYCHRL" or "Administrative Code"), N.Y. Amin. L. §§

8-101 *et seq*., and 42 U.S.C. § 1981. Defendants' conduct was willful and wanton and showed a reckless disregard for Plaintiff and the laws prohibiting discrimination and retaliation, which caused and continues to cause Plaintiff to suffer substantial economic and noneconomic damages, and severe mental anguish and emotional distress.

**VENUE**

2. Venue is proper in this County because MLS's principal place of business is located in New York County.

**PARTIES**

3. Plaintiff is an individual residing in Bergen County, New Jersey.

4. Plaintiff is a Black female.

5. At all relevant times herein, MLS was and is a Delaware limited liability company with a principal place of business located at 420 5th Avenue, New York, New York 10018.

6. At all relevant times herein, Neale was and is MLS's President and Chief Administrative Officer, possessed operational control over MLS, and has the power to, *inter alia*, hire and fire employees, establish and pay their wages, set their work schedules, determine their job duties and responsibilities, maintain their employment records, and/or otherwise had the authority to alter the terms and conditions of the employees' employment, including Plaintiff.

7. At all relevant times herein, Stevenson was and is the Deputy Commissioner of MLS, possessed operational control over MLS, and has the power to, *inter alia*, hire and fire employees, establish and pay their wages, set their work schedules, determine their job duties and responsibilities, maintain their employment records, and/or otherwise had the authority to alter the terms and conditions of the employees' employment, including Plaintiff.

8. Neal and Stevenson were Plaintiff's employer within the meaning of the NYSHRL and NYCHRL.

## STATEMENT OF FACTS

9. On or about January 22, 2017, Plaintiff was hired as the Vice President of the Integrated Media Solutions ("IMS") group. IMS played a critical role by providing media strategies to several other departments and sub-divisions of those departments, including Business Alliances (which had previously absorbed the Digital Sales team during a restructuring prior to Plaintiff's hiring), and Media and Partnership Marketing, to name a few.

10. The IMS group had many functions. It worked to ensure that the sponsors or partners (usually large corporations) were obtaining the best value for their dollars. This was done by, among other things, creating strategies to package content to attract the most viewers on platforms like ESPN or FOX, engaging social media platforms and creating social media products, and using databases and technology to market the MLS product and attract more viewers and fans. IMS also worked to monetize assets by incorporating partners' and sponsors' brand into existing databases and social media platforms and to create other revenue sources for MLS. In performing these functions, Plaintiff and the IMS team acted as a liaison between the sponsors and partners, the media networks such as ESPN and FOX, and the MLS Departments and sub-divisions, to ensure the sponsors and partners received the best value for their investments into MLS and that MLS, itself, was promoted in the best way possible. Plaintiff and IMS were also integral with respect to MLS's relationship with the large media outlets.

11. When initially hired, Plaintiff reported directly to Kathy Carter ("Carter"), who was President of the Business Ventures group. By April 2018, when Carter ran for President of the U.S. Soccer Federation, Plaintiff reported directly to Stevenson.

12. In or around the first quarter of 2018, Stevenson revealed his mindset about Black people, which was based on tired and offensive stereotypes. For instance, at that time, MLS hired the rapper 2 Chainz to star in the MLS All-Star Concert Event. In a meeting at which

Plaintiff was present, Stevenson raised the issue of security for the event. Even though this was a ticketed event with a known capacity at the arena, he questioned whether additional security was needed because of the "type of people" who were interested in 2 Chainz. It was painfully obvious that Stevenson was essentially asking the participants at this meeting whether additional security was needed because a lot of Black people would be attending the event.

13. Plaintiff was shocked and taken aback by the comment and could not believe how insensitive and ignorant the comment was. At that time, Plaintiff remained silent for fear of retaliation. Plaintiff was regularly subjected to ignorant and uncomfortable comments by MLS Executives and employees, but at that time, she believed that to succeed at MLS, she needed to simply endure or ignore them so as not to ruin her chances to elevate in the company. Plaintiff, however, did discuss the comment privately with Jennifer Cramer ("Cramer"), a Senior Vice President of Partnership Marketing, who agreed that Stevenson's comment was racist and offensive.

14. MLS's apathy toward the treatment of Black people at MLS and their absence from positions of power and influence was revealed in or about April 2019. At that time, MLS was in the process of accepting Chic-Fil-A as a sponsor. Many staff members were upset by that decision given Chic-Fil-A's stance on LGBTQ+ rights. The Commissioner scheduled a townhall style meeting to discuss the staff's concerns.

15. At the townhall meeting, MLS appeared to listen to and address the concerns that staff had regarding LGBTQ+ rights. Plaintiff felt a disconnect between MLS's purported newly found concern for a sponsor's position on LGBTQ+ rights and its apathy and animus toward the rights of anyone else, including Black employees, at MLS. For instance, MLS did not have any sort of diversity or inclusion training, yet was examining the policies of Chic-Fil-A in deciding whether it could be a corporate sponsor. Plaintiff viewed this as hypocritical and posed a

question for the panel at the townhall. In sum and substance, Plaintiff asked whether MLS had a plan or was planning to conduct diversity and inclusion training for the MLS staff given its purported concern over "civil rights."

16. The Commissioner did not answer the question, and passed the question to Neal, who was also in charge of the Human Resources division. Neal did not provide an answer and passed the question to Jennifer Carrol ("Carrol"), who was the Vice President of Human Resources and Culture. Carrol simply provided a vague statement about having respect for all training. Neither Plaintiff nor any other employees understood what training Carrol was referencing, as the MLS employees never were required to attend any kind of diversity or inclusion training.

17. Neal's apathy for diversity and the rights of minorities at MLS was further shown in or around 2019 when a group of Black employees, known as "Pitch Black," submitted a request to have their group acknowledged and recognized by MLS. This group discussed race issues, the treatment of minority groups at MLS, and diversity and inclusion within MLS. MLS recognized other groups which were formed to discuss and advance the interests of its members who often shared similar races, ethnicities, gender, or interests. Neal, however, ignored Pitch Black's submission, and upon information and belief, the group's application sat on Neale's desk untouched for many months, and she never moved the request up the chain to Commissioner Don Garber (until the George Floyd incident), in or around May of 2020.

18. In or around Winter or Spring 2019, MLS restructured some of its divisions because Stevenson purportedly had too many direct reports. IMS was placed under the Partnership Marketing division, led by Cramer, and Cramer became Plaintiff's direct report. However, Stevenson told Plaintiff that the change was only for administrative purposes and that

he would continue to work closely with Plaintiff, stating that Plaintiff had the "best media mind" at MLS and would continue to be a part of the 2023 MLS Media Rights taskforce.

19. Although Plaintiff no longer directly reported to Stevenson, she and Stevenson continued to work together closely.

20. Plaintiff was a part of MLS's "media task force" and participated in those meetings. As part of this task force, Plaintiff was scheduled to travel to Germany with Seth Bacon ("Bacon"), Senior Vice President of Media, in connection with MLS's 2023 media rights negotiations.

21. When the COVID-19 pandemic disrupted the MLS league in or around March 2020, MLS was looking for ways to retain corporate partners and sponsors and fulfill their obligations to such partners. The IMS group was one of the only groups that was able to continue to deliver values for the corporate partners and sponsors while games were not being played.

22. In or around April 2020/May 2020, Cramer asked Plaintiff to prepare an analysis and report about how MLS could continue to provide value to its corporate partners and sponsors during the COVID-19 pandemic, with an eye toward the current contracts MLS had with corporate sponsors and media outlets. Plaintiff prepared a thorough report and provided it to Cramer.

23. Shortly thereafter, Stevenson asked Plaintiff to present the report to his Executive Team, and to walk him and his direct reports through the best way to retain revenue for MLS. Plaintiff received universal praise for the report and presentation. In fact, Carter Ladd, the Senior Vice President of Business Ventures division, sent Plaintiff a message during the presentation complimenting her. Stevenson ended the meeting stating that he "felt good" at how

the IMS team, headed by Plaintiff, was supporting the Partnership Marketing team in retaining revenue during the pandemic.

24. The IMS team was performing well in their chief functions, and Plaintiff was becoming more involved in high level meetings and discussions, including the meetings and discussions involving the media rights negotiations. Plaintiff was also becoming more involved with, and invited to meetings about, other commercial ventures of U.S. Soccer, partner summaries and the financials.

25. On May 25, 2020, George Floyd was murdered by a Minnesota police officer and the video of the killing was quickly circulated allowing the world to see what transpired. The incident drew the sympathy of a significant portion of this country for the plight of Black Americans, which resulted in an examination of racism in America. However, as most key major league sports leagues, such as the NBA, NFL and MLB, made official statements denouncing the incident and supporting of their Black athletes, MLS was silent.

26. Four days after the Floyd murder, MLS remained silent. At that time, on or about May 29, 2020, Plaintiff emailed Stevenson about Mr. Floyd's murder and encouraged Commissioner Garber to address the incident. Plaintiff's prompting to MLS to issue a statement did not work.

27. Six days after Mr. Floyd was murdered, MLS was still silent on the issue. Because of the embarrassment Plaintiff and many of the Black MLS employees felt regarding MLS's silence, they met on or about May 31, 2020 to address MLS's silence on the issue as well as other issues relating to race at MLS.

28. Only after receiving significant pressure from Plaintiff and the other members of Pitch Black, and being the subject of critical media coverage because of its silence, MLS finally released a statement on June 1, 2020, seven days after the murder.

29. At this moment, the country was transfixed on the issues of racism, and the Floyd murder aroused sympathy toward Black Americans for the racism and discrimination that the incident exposed. This is shown by the fact that even MLS felt compelled to issue a statement on the issue.

30. Many Black Americans, including Plaintiff, previously had the disposition that to succeed in America, they needed to stay silent and simply endure offensive racial comments, harassment, and discrimination, with the hope that their silence will provide sufficient comfort to the power structure (usually made up of white individuals) to allow them to advance and succeed. That is what Plaintiff did prior to the Floyd murder.

31. For Plaintiff, however, the George Floyd murder compelled her to be more honest and forthcoming about the racial discrimination and harassment she and her fellow Black employees and friends experience at their respective workplaces, including MLS, and the systemic bars set up to keep Black people out of power at those workplaces, including MLS.

32. Plaintiff aimed at raising the discrimination issues at MLS in a constructive way, with an eye toward increasing everyone's awareness and understanding of the Black experience at MLS. In that vein, on or about June 11, 2020, Plaintiff wrote to Chief Financial Officer Sean Prendergast ("Prendergast") about the systemic discrimination at MLS. Plaintiff chose to reach out to Prendergast because he had previously expressed views that were sympathetic to Black MLS employees. She thanked him for his support. Prendergast admitted that MLS's response to the George Floyd incident was "shitty" and that an insufficient number of people of color are at the executive table at MLS.

33. On or about June 16, 2020, Plaintiff and Pitch Black organized a townhall to celebrate Juneteenth and discussed race issues at MLS and throughout the society at large. Plaintiff was one of the three speakers at this virtual townhall. She opened her heart about racial

discrimination and how Black people, including herself, often stay silent about such discrimination in the face of those in power. Plaintiff explained how valuable it was to be able to discuss the difficulties she faced because of her race to other Black employees and members of Pitch Black when she felt she was unable to raise the issue with the executives at MLS.

34. Plaintiff provided an example of when Stevenson (she did not use his name during the presentation) raised the issue of needed additional security at the music event during All-Star weekend because of "the people who are attracted to" the rapper 2 Chainz. She provided another example of offensive comments made at MLS regarding those who knelt during the National Anthem to support anti-racism. She explained the need for MLS to have training about unconscious bias. She discussed the concerns Black employees have regarding race issues at MLS and the need to have white colleagues understand those concerns so they can be addressed. She stated that having white allies was critical because there was little to no Black representation in the decision-making positions and upper echelon of MLS.

35. Plaintiff ended her speech on a positive and inspirational note, stating that she had spoken to several high executives at MLS and that they seemed to understand Plaintiff's position and the plight to end racism and racial discrimination.

36. It was at this townhall event that an employee at the time, Brent Jones, confirmed that Pitch Black's submission made in 2019 to be recognized by MLS remained on Neal's desk and was not addressed until after the Floyd murder.

37. After the townhall, Plaintiff received several emails from her fellow employees thanking her for having the courage to speak up about the racism and bias at MLS.

38. Although Plaintiff raised issues of discrimination at MLS during her speech on or about June 16, 2020, MLS did not follow up with her regarding her complaints and did not conduct any sort of investigation into racial comments, discrimination and the barriers she and

other Black employees endured while at MLS. MLS did not schedule or conduct anti-bias training.

39. Rather, as the euphoria of sympathy caused by the George Floyd incident began to wane, Stevenson began to treat Plaintiff differently than he had before and retaliated against her. All of a sudden, Plaintiff was no longer invited to review or discuss MLS partner financials and retentions with Stevenson and his executive team. These conversations continued, but Plaintiff was no longer asked to attend or provide her input.

40. Plaintiff was no longer invited to the meetings relating to media rights negotiations or involved in those discussions. In fact, she was told such meetings were on hold and did not occur, apparently to make her feel better, but they did take place without her. She was simply removed from the team regarding the media rights negotiations.

41. Plaintiff had taken a large role in navigating the interplay between the "MLS is Back" tournament in Orlando, Florida, and the desire for Black Players for Change (a coalition of Black MLS players) to organize a demonstration at the first match of the tournament. With Plaintiff in charge of ESPN commercial matters, she worked closely with Black Players for Change, ESPN, and the corporate sponsors to coordinate the varying interests of all involved.

42. To thread the needle of the varying interests, Plaintiff met with the ESPN sponsorship marketing team to ensure that MLS's corporate partners would meet their contractual obligations and that broadcast partners would have enough marketing opportunities. However, out of nowhere, Plaintiff was removed from this role and Stevenson unilaterally took over Plaintiff's work with ESPN in advance of the opening game of the tournament.

43. Plaintiff received several text messages from her connections at ESPN asking why she was no longer involved in ESPN's marketing matters for the event. Plaintiff was never provided a reason as to why she was taken out of her position there.

44. After Plaintiff's townhall speech, Stevenson distanced himself from Plaintiff, took away several of her responsibilities, stopped her in her tracks with regard to being involved in the media rights negotiations, kept her out of any executive or finance meetings, and no longer involved her in the key issues under his authority. Stevenson even directed Plaintiff to submit reports, which she previously provided to Stevenson directly, to an intermediary so that the intermediary submitted the report to Stevenson. Stevenson excluded and ostracized Plaintiff after the Juneteenth speech.

45. When there were other incidents of violence against Black people by the police or overt racists, such as the Ahmaud Arbery killing, only then did Stevenson call or communicate with Plaintiff. He asked how Plaintiff was doing when these events occurred. However, Stevenson essentially cut off his communication with Plaintiff regarding the substantive work issues they previously discussed and worked on. After the Juneteenth speech, Stevenson could only view Plaintiff in terms of her Blackness, and not as the intelligent, hard-working, and creative professional that she was, who could bring much to the table to help MLS's operation. Stevenson now only viewed Plaintiff as a *Black* woman, and discriminated against her because she was Black, and because she raised issues of discrimination, racism, and unconscious bias at MLS.

46. After Plaintiff's Juneteenth speech and taking a leadership position in Pitch Black, besides removing key responsibilities from her and no longer speaking to her on the substantive issues they previously discussed, Stevenson's tone and attitude toward Plaintiff turned nasty.

47. For instance, Plaintiff requested a temporary employee to assist her IMS team because of how busy they were. Plaintiff requested help from Brandon Cheyney ("Cheyney"), an MLS Human Resource professional, to have this request approved given MLS's hiring freeze based on the COVID-19 pandemic. Plaintiff provided Cheyney with a detailed outline describing

the reasons for the temporary hire and the amount of time they needed this hire for; the request was initially approved. After Plaintiff interviewed an individual for this role, Plaintiff was informed by Cramer that Neale stopped Plaintiff's request.

48. Plaintiff subsequently reached out to Stevenson for help. Stevenson requested Plaintiff plan a meeting with information as to what she needed and why. Plaintiff immediately began working on the meeting, which took place later that day on a Friday. Plaintiff started the meeting reviewing the key points of why the meeting was called. Stevenson scolded her and cut her off, telling her, in sum and substance, to "get to the point." He then demanded that Plaintiff provide information as to the amount of campaigns the IMS group was running. When Plaintiff responded that her team has at least fifty campaigns, Stevenson refused to believe it and immediately demanded the details and documentation to prove what Plaintiff stated was true. Plaintiff provided a report to Stevenson the following Monday, showing that IMS had over 70 campaigns. Stevenson did not even acknowledge receipt of this report until approximately one and one-half weeks later.

49. In another example, Stevenson blamed Plaintiff for problems relating to a contract in which Plaintiff played no role in negotiating. Stevenson knew about the terms of the contract but pretended that he just found out about it.

50. Stevenson berated Plaintiff for not having providing certain information to him relating to that contract even though that information was not yet available to provide.

51. Stevenson's playing of the blame game towards Plaintiff was another reason that led Plaintiff to believe she was being set up and scapegoated. This faux blame was made in the context of Stevenson removing her from key responsibilities, excluding her from meetings and other discussions, and his nasty conduct toward her, as discussed above.

52. Based on Stevenson's abrupt change toward Plaintiff since the Juneteenth speech, in or around early October 2020, Plaintiff met with Cheyney in the Human Resources Department to discuss the matter. She reported how Stevenson removed responsibilities from her, excluded her from meetings, and now was irrationally blaming her for things in which she played no role.. She conveyed to Cheyney that she was concerned that these abrupt changes by Stevenson were because of her Juneteenth speech and involvement with Pitch Black, but hoped that was not the case. Cheyney, who is also Black and a member of Pitch Black, stated that he hoped that was not the case either. However, neither Cheyney nor anyone else at MLS investigated Plaintiff's complaint against Stevenson.

53. Approximately one month after her complaint to Cheyney, on or about November 20, 2020, Plaintiff received a Zoom email invitation to meet with Cramer and Cheyney. Cramer told Plaintiff she was being "laid off" due to circumstances related to the COVID-19 pandemic and a restructuring of the IMS team. Plaintiff told Cramer and Cheyney that her discharge did not make sense as her group was extremely busy; she had just asked for a temporary employee. Plaintiff told Cramer how she informed Cheyney six weeks prior that she was afraid that she was being retaliated against because of her participation in Pitch Black and Juneteenth, which Cheyney acknowledged. However, MLS, again, did nothing and discharged Plaintiff under the pretext of restructuring.

54. Although Defendants told Plaintiff that she was being laid off because of restructuring, soon after the layoff, MLS placed advertisements to hire two people to perform functions that were under the auspices of the IMS team. This is further proof that Defendants proffered reason for laying off Plaintiff was a pretext for discrimination and retaliation.

55. Shortly after Plaintiff was discharged, Cheyney resigned.

56. A few months later, another Black female, Kristin Hurst, resigned after being relieved of client-facing duties in-part according to her supervisor, because she spent too much time on Pitch Black issues.

57. Brent Jones, another Human Resources professional who confirmed the fact that Neale did not address Pitch Black's application to be recognized, resigned and left earlier than originally scheduled, following the townhall meeting with the staff where he advocated to the Commissioner and staff for Pitch Black's application to be recognized.

58. Plaintiff, as a Black woman, had the courage to raise issues of race within MLS, regarding offensive comments, the need for training, and the lack of inclusion and diversity, especially within the upper echelon of the organization. She did so in a constructive, professional, and insightful way. Rather than investigate, discuss, and make a plan to eradicate the racism and discrimination in the organization, Stevenson, Neale and MLS punished her for it. They punished her for being Black, for honestly speaking about incidents of discrimination at MLS, for raising the issue for the need of diversity within the high levels of MLS, and for honestly speaking about barriers she and other Black employees faced at MLS.

59. When Plaintiff complained about the discrimination and retaliation she faced during the Juneteenth speech, during conversations with executives right after the Floyd murder, and with Cheyney in or about October 2020, MLS failed to investigate, address or remedy the issue, but instead discharged her in or around November 2020 under the guise of "restructuring."

60. The discrimination and retaliation against Plaintiff for being Black, for raising issues regarding racism and discrimination at MLS, and for complaining about discrimination and retaliation after her Juneteenth speech, could not be more obvious.

**AS AND FOR A FIRST CAUSE OF ACTION**
**AS AGAINST ALL DEFENDANTS**
**(Race Discrimination in Violation of the New York City Administrative Code)**

61. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

62. The Administrative Code of the City of New York § 8-107[1] provides that it shall be an unlawful discriminatory practice: (1) For an employer or an employee or agent thereof, because of the actual or perceived . . . race . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person or to discriminate against such person in person in compensation or in terms, conditions or privileges of employment.

63. Plaintiff is Black.

64. Defendants discharged Plaintiff in or around November 2020 because she was Black.

65. Defendants maintained a mind-set that consisted of tired and offensive stereotypes of Black people as exemplified by Stevenson's concern that additional security was needed at a concert event because 2 Chainz was the performer and many Black people would be attending.

66. Defendants were wholly apathetic to race issues at MLS, as exemplified by Neale's failure address Pitch Black's submission to be recognized by MLS, while other groups were recognized.

67. After Plaintiff became a leader in the Pitch Black group, addressed racial issues with MLS Executives, and made a speech during a townhall event on Juneteenth, Defendants took away several of her responsibilities and excluded her from functions in which she was previously involved.

68. Also, after those instances, Defendants blamed only Plaintiff for a contract issue in which she played no role in negotiating and she was treated in a nasty manner, particularly by Stevenson.

69. Stevenson was no longer able to work with Plaintiff in a constructive way once Plaintiff discussed issues of race and expressed her Blackness openly. Stevenson resorted to only speaking to Plaintiff when a Black person was killed by police or in a racial attack; he was no longer able to interact and work with Plaintiff on the substantive issues of work because she was Black and had openly expressed her Blackness.

70. Defendants' apathy and lack of interest in the racial discrimination at MLS was further displayed by the lack of anti-bias and discrimination training at MLS, and their failure to investigate or address any of the issues raised by Plaintiff regarding race and discrimination in May and June 2020.

71. Defendants' bias against Plaintiff became obvious to Plaintiff, which resulted in her making a complaint to Human Resources about how Stevenson treated her differently once she made assertions about race and expressed her Blackness. Defendants did not investigate or address Plaintiff's complaint, which further shows their apathy to racial discrimination.

72. Defendants discharged Plaintiff in November 2020, claiming it was part of a restructuring of her IMS division. However, shortly thereafter, Defendants posted two job listings seeking employees to do functions which were the same or similar to functions within IMS. This shows that Defendants' proffered reason for Plaintiff's discharge was a pretext for race discrimination.

73. Shortly after Plaintiff was discharged, another Black female was relieved of client-facing duties because she purportedly spent too much time working with Pitch Black. Upon information and belief, that employee resigned based on the reduction of her duties and

lack of support demonstrated by MLS's view that she was spending too much time working with Pitch Black.

74. The actions by Defendants in discharging Plaintiff based on her being Black violates New York City Administrative Code Title 8.

75. As a direct and proximate result of Defendants' race discrimination in violation of the Administrative Code, Plaintiff suffered and continues to suffer monetary losses, including but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages.

76. As a direct and proximate result of Defendants' race discrimination in violation of the Administrative Code, Plaintiff suffered, and continues to suffer severe, mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

77. Plaintiff is entitled to attorney's fees and costs, and because Defendants' conduct was willful, reckless, outrageous, intentional and/or malicious, Plaintiff is also entitled to punitive damages.

**AS AND FOR A SECOND CAUSE OF ACTION**
**AS AGAINST ALL DEFENDANTS**
**(Retaliation in Violation of the New York City Administrative Code)**

78. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

79. The New York Administrative Code Title 8, § 8-107(1)(e) provides that it is unlawful to retaliate or discriminate against an employee who opposes any practice forbidden by that section of the law.

80. Plaintiff complained about racially offensive comments made at MLS, the lack of unconscious bias training at MLS, the lack of Black representation at the higher levels at MLS, and the failure of those at the upper echelon to address or understand the discrimination felt by Plaintiff and other Black employees at MLS, during her speech on Juneteenth.

81. Also, after the murder of George Floyd, Plaintiff spoke with Executives at MLS, including Stevenson, Bacon and Prendergast, about racial discrimination at MLS and the need for diversity within the company at the highest levels.

82. Plaintiff complained to Cheyney in October 2020 about how she believed Stevenson was discriminating against her for raising issues of race after the George Floyd murder.

83. As a result of Plaintiff's complaints about racial discrimination as set forth above, Plaintiff was ostracized and excluded by Stevenson. Plaintiff had job duties taken away, and she was excluded from meetings and discussions to which she was invited prior to her complaints relating to race.

84. As a result of Plaintiff's complaints, she was unfairly targeted and blamed for problems in which she had no role in creating.

85. As a result of Plaintiff's complaints, she was discharged in November 2020, approximately one month after complained to Cheyney that she was being discriminated against by Stevenson because of the issues she raised in her Juneteenth speech.

86. Plaintiff was discharged in retaliation for her raising issues regarding racial discrimination, unconscious bias and the lack of diversity at MLS.

87. The retaliation violates the New York City Administrative Code Title 8, § 8-107(1)(e).

88. As a direct and proximate result of Defendants' retaliation in violation of the Administrative Code, Plaintiff suffered and continues to suffer monetary losses, including but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages.

89. As a direct and proximate result of Defendants' retaliation in violation of the Administrative Code, Plaintiff suffered, and continues to suffer severe, mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

90. Plaintiff is entitled to attorney's fees and costs, and because Defendants' conduct was willful, reckless, outrageous, intentional and/or malicious, Plaintiff is also entitled to punitive damages.

**AS AND FOR A THIRD CAUSE OF ACTION**
**AS AGAINST MLS**
**(Race Discrimination in Violation of New York Executive Law § 296 *et seq*)**

91. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

92. Executive Law § 296(1)(a) provides that: "It shall be an unlawful discriminatory practice for an employer . . . because of an individual's race . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

93. Plaintiff is Black.

94. MLS discharged Plaintiff in November 2020 because she was Black.

95. MLS executive maintained a mind-set that consisted of tired and offensive stereotypes of Black people as exemplified by Stevenson's concern that additional security was

needed at a concert event because 2 Chainz was the performer and many Black people would be attending.

96. MLS was wholly apathetic to race issues at MLS, as exemplified by Neal's failure address Pitch Black's submission to be recognized by MLS, while other groups were recognized.

97. After Plaintiff became a leader in the Pitch Black group, addressed racial issues with MLS Executives, and made a speech during a townhall event on Juneteenth, Defendants took away several of her responsibilities and excluded her from functions in which she was previously involved.

98. Also, after those instances, Stevenson blamed only Plaintiff for problems in which she had no role in creating, and she was treated in a nasty manner, particularly by Stevenson.

99. Stevenson was no longer able to work with Plaintiff in a constructive way once Plaintiff discussed issues of race and expressed her Blackness openly. Stevenson resorted to only reaching out to, and speaking with Plaintiff when a Black person was killed by police or in a racial attack and related topics he no longer engaged Plaintiff or interacted with her about substantive issues of work because she was Black and had openly expressed her Blackness.

100. MLS's apathy and lack of interest in the racial discrimination at MLS was further displayed by the lack of anti-bias and discrimination training at MLS, and its failure to investigate or address any of the issues raised by Plaintiff regarding race and discrimination in May and June 2020.

101. MLS's bias against Plaintiff became obvious to Plaintiff, which resulted in her making a complaint to Human Resources about how Stevenson treated her differently once she made assertions about race and expressed her Blackness. MLS did not investigate or address Plaintiff's complaint, which further shows their apathy to racial discrimination.

102. MLS discharged Plaintiff in November 2020, claiming it was part of a restructuring of her IMS division. However, shortly thereafter, MLS posted two job listings seeking employees to do functions which were the same or similar to functions within IMS. This shows that MLS's proffered reason for Plaintiff's discharge was a pretext for race discrimination.

103. Shortly after Plaintiff was discharged, another Black female was relieved of key client-facing duties and was told by her manager that she purportedly spent too much time working with Pitch Black. She too reported this to Human Resources and subsequently accepted another position due to the loss of client-facing duties and a general feeling of being targeted after Juneteenth and because of her leadership role with Pitch Black.

104. The actions by MLS in discharging Plaintiff based on her being Black violates Executive Law § 296.

105. As a direct and proximate result of MLS's race discrimination in violation of Executive Law § 296, Plaintiff suffered and continues to suffer monetary losses, including but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages.

106. As a direct and proximate result of MLS's race discrimination in violation of Executive Law § 296, Plaintiff suffered, and continues to suffer severe, mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

107. Plaintiff is entitled to attorney's fees and cost, and because MLS's actions were willful and wanton, Plaintiff is also entitled to punitive damages.

**AS AND A FOURTH CAUSE OF ACTION**
**AS AGAINST MLS**
**(Retaliation in Violation of New York Executive Law § 290 *et seq*)**

108. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

109. Executive Law § 296(7) provides that: "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practice forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

110. Plaintiff complained about racially offensive comments made at MLS, the lack of unconscious bias training at MLS, the lack of Black representation at the higher levels at MLS, and the failure of those at the upper echelon to address or understand the discrimination felt by Plaintiff and other Black employees at MLS, during her speech on Juneteenth.

111. Also, after the murder of George Floyd, Plaintiff spoke with Executives at MLS, including Stevenson, Bacon and Prendergast, about racial discrimination at MLS and the need for diversity within the company at the highest levels.

112. Plaintiff complained to Cheyney in October 2020 about how she was afraid that Stevenson was discriminating against her for raising issues of race after the George Floyd murder.

113. As a result of Plaintiff's complaints about racial discrimination as set forth above, Plaintiff was ostracized and excluded by Stevenson. Plaintiff had job duties taken away, and she was excluded from meetings and discussions to which she was invited prior to her complaints relating to race.

114. As a result of Plaintiff's complaints, she was unfairly targeted, removed from key strategy and broadcast partner meetings and blamed for problems that she had no role in creating.

115. As a result of Plaintiff's complaints, she was discharged in November 2020, approximately one month after complained to Cheyney that she was being discriminated against by Stevenson because of the issues she raised in her Juneteenth speech.

116. Plaintiff was discharged in retaliation for her raising issues regarding racial discrimination, unconscious bias, and the lack of diversity at MLS.

117. The retaliation violates New York Executive Law § 296(7).

118. As a direct and proximate result of MLS's retaliation in violation of the Executive Law § 296(7), Plaintiff suffered and continues to suffer monetary losses, including but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages.

119. As a direct and proximate result of MLS's retaliation in violation of the Executive Law § 296(7), Plaintiff suffered, and continues to suffer severe, mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

120. Plaintiff is entitled to attorney's fees and costs, and because Defendants' conduct was willful, reckless, outrageous, intentional and/or malicious, Plaintiff is also entitled to punitive damages

**AS AND FOR A FIFTH CAUSE OF ACTION**
**AS AGAINST NEALE AND STEVENSON**
**(Aiding and Abetting in Violation of New York Executive Law § 290 *et seq*)**

121. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

122. New York Executive Law § 296(6) provides that: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

123. As detailed above, Neale and Stevenson (the "Individual Defendants") engaged in discriminatory and retaliatory conduct, including the decision to discharge Plaintiff.

124. Stevenson and Neale actively participated in the discrimination and retaliation through their involvement in the decision to discharge Plaintiff.

125. The Individual Defendants knowingly and/or recklessly aided, abetted, incited, compelled, and coerced the unlawful employment practices, and discrimination against Plaintiff in violation of Executive Law § 296(6). Plaintiff suffered and continues to suffer, monetary losses, including but not limited to, loss of past and future income, compensation and benefits, for which he is entitled to an award of monetary damages and other relief.

126. Plaintiff also suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

127. As a direct and proximate result of the Individual Defendants' unlawful and discriminatory actions in violation of Executive Law § 296(6), Plaintiff is entitled to punitive damages, plus attorneys' fees and costs.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**AS AGAINST MLS**
**(Discrimination Based on Race in Violation of 42 U.S.C. § 1981)**

128. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

129. Plaintiff is a member of a protected class in that she is Black.

130. Plaintiff, as described *supra*, was subject to inappropriate and discriminatory conduct by Defendants based on Plaintiff's race.

131. Defendants discriminated against Plaintiff on the basis of race in the making, performance, enforcement and modification of her employment with Defendants, and by not allowing Plaintiff to enjoy all the benefits, privileges, terms and conditions of her employment relationship with Defendants in the same way white employees did.

132. Plaintiff suffered adverse actions as a result of Defendants' conduct by, *inter alia*, being discharged, and not being treated in a manner as similarly situated individuals working for Defendants who were white.

133. The conduct of Defendants as alleged above violated 42 U.S.C. § 1981.

134. By engaging in the foregoing conduct, Defendants acted with malice and/or with reckless disregard for Plaintiff's rights under Section 1981.

135. As a result of the discrimination, Plaintiff suffered severe physical injury, emotional distress, loss of enjoyment of life, lost wages, and other damages.

136. Plaintiff was damaged in an amount that will be determined at trial, and Plaintiff is entitled to punitive damages and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court grant judgment in her favor and against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by federal, state, and local laws;

B. Awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, emotional pain and suffering and other physical and mental injuries;

C. Awarding Plaintiff damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but limited to, compensation for her severe mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, emotional pain and suffering and other physical and mental injuries;

D. Awarding Plaintiff damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

E. Awarding Plaintiff punitive damages, in an amount to be determined at trial;

F. Awarding Plaintiff costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

G. Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: Garden City, New York
August 5, 2021

Stagg Wabnik Law Group LLP

By: /s/David R. Ehrlich
Debra L. Wabnik
David R. Ehrlich
Amanda B. Slutsky
*Attorneys for Plaintiff Karine Travieso*
401 Franklin Avenue, Suite 300
Garden City, New York 11530
(516) 812-4550

TO:

Major League Soccer L.L.C.
420 5th Avenue
New York, New York 10018

JoAnn Neale
8 Corin Court
Syosset, New York 11791

Gary Stevenson
7 West 81st Street
New York, New Yok 10024